## Case No. 7,046.

INGRAHAM et al. v. The NAYADE.

[Newb. 366; 1 15 Hunt, Mer. Mag. 486.]

District Court, D. Louisiana. Oct., 1846.

1 [Reported by John S. Newberry, Esq.]

T. J. Durant, U. S. Dist. Atty., for captors.

C. Roselius, for claimants.

McCALEB, District Judge. The vessel against which the libel in this case was filed, was seized off the harbor of Vera Cruz, on the 30th of August last, by the commander of the United States brig of war Somers, belonging to the blockading squadron in the Gulf of Mexico, and sent to this port for condemnation. She was taken as a prize of war, upon the ground that she had violated the blockade now rigidly enforced by our squadron against the ports of Mexico. From the evidence introduced on the part of the claimants, it appears that the Nayade is owned by Solomon and Berrend Roosen, merchants and ship owners of the Hanseatic city of Hamburg: that she sailed from Hamburg on the 5th of June last for Vera Cruz, and arrived off that port on the 27th of August. She was boarded by an officer from the brig Somers, who informed the master that the ports of Mexico were in a state of blockade, and that he must leave the coast. The boarding officer before leaving the vessel, inquired of the master, if he wanted anything, and received for answer that he wanted nothing. The captain, in accordance with the suggestions of the boarding officer, declared his intention to proceed to the port of Havana, and set sail accordingly. He had sailed on his course for forty-eight hours, when finding he had made only fifty miles, and the vessel being then becalmed, he became alarmed lest his supply of water, then reduced to about 250 gallons, would be insufficient, and determined to return to the squadron and obtain an additional quantity, and at the same time get permission to land his passengers, amounting to four men, who were on their way to the mines of Mexico. He returned accordingly, and on the morning of the 30th of August, came in sight of the Somers and sailed directly for her. When he arrived within hailing distance, he asked permission to go aboard. Permission being granted, when he got on board the Somers, he was informed that he had been once warned off, and having returned, his vessel would be taken possession of as a prize of war, for having violated the blockade. A prize master was, on the following day, sent on board the Nayade, which was taken to Green Island, where her passengers obtained permission to land, and an additional supply of water was put on board by Lieut. Berryman, the prize master, under whose command the vessel proceeded to this port. Want of water is the excuse alleged by the master of the Nayade for returning to the squadron, after being warned away. Under the order granted for taking additional proof, the testimony of Lieut. Berryman was taken on behalf of the claimants. He testified that he took charge of the Nayade as

prize master, on the 31st of August. The prize crew, and the number of the crew of the Nayade, left on board, amounted in all to fifteen men. They were sixteen days coming from Green Island to the Balize. There were about one hundred gallons of drinkable water on board when they reached the Balize. The Nayade is a very indifferent sailer. They had little occasion to sail against the wind. She is a poor vessel to sail against the wind. The first five days after leaving Vera Cruz for New Orleans, she did not make more than two hundred and fifty miles, in consequence of light winds, and her very indifferent qualities for sailing under such circumstances. When the witness was put in possession of the Nayade as prize master, he made inquiry but no examination in regard to the quantity of water on board. After he took command, and until he reached New Orleans, the wind was generally favorable, being from the south, and sometimes from the westward. Such winds would have been fair for a voyage to Havana.

The testimony, both on behalf of the libelants and claimants, will be hereafter more particularly noticed, in examining the different questions of law growing out of the merits of the case. It is urged on the part of the captors: First, that the alleged want of water does not present such a case of absolute and overpowering necessity, as will justify the return of the Nayade to the blockaded port, after she received notice of the existence of the blockade. Secondly, that the master, after having been asked by the boarding officer of the Somers, if he stood in need of anything, and especially if he stood in need of water or provisions, and answering that he needed nothing, was inexcusable in returning three days afterwards to the squadron to take in a supply of water. His alleged want of water was a mere pretext for returning to the blockaded port. Thirdly, that even if the declaration that he was in want of water were true, the captain of the Nayade has not shown that he could not go to another port not blockaded. On behalf of the claimants, it is contended that the want of water, under the circumstances established by the evidence, presents such a case of absolute and overpowering necessity, as will, in law, justify the conduct of the master. Secondly, that there is no evidence which will authorize the court in coming to the conclusion that any attempt was made to violate the blockade. Thirdly, that under no circumstances can the cargo be held liable to confiscation, since it is clearly established by the evidence that it is physically impossible that the blockade of the ports of Mexico could have been known at Hamburg, at the time the Nayade set out on her voyage; and there being no evidence to show that the master was the authorized agent of the owners of the cargo, the interest of the latter cannot be affected by the attempt of the master to enter the blockaded port, even if such attempt could be proved.

The principles of law applicable to trade with blockaded and besieged places, are well understood, and universally recognized by writers upon public law. It is well established "that by the usage of nations, and according to the principles of natural reason, it is not lawful to carry anything to places blockaded and besieged. It is sufficient that there be a siege or blockade to make it unlawful to carry anything, whether contraband or not, to a place thus circumstanced; for those who are within may be compelled to surrender, not merely by the application of force, but also by the want of provisions and other necessaries. If, therefore, it shall be lawful to carry to them what they are in need of, the belligerent might thereby be compelled to raise the siege or blockade, which would be doing him an injury, and, therefore, would be unjust. And because it cannot be known what articles the besieged may want, the law forbids in general terms carrying anything to them; otherwise disputes and altercations would arise, to which there would be no end." Bynk. c. 11, p. 82; Gro. de J. B. lib. 3, c. 1, § 5, No. 8; Wheat. Hist. Law Nat. 137. With the clear and unequivocal recognition in favor of belligerents of the right of blockade as a right of war, let us inquire what acts on the part of neutrals are regarded as a violation of that right, and under what circumstances those acts may be excused. We shall of course refer only to such acts as have a direct relevancy to the merits of the case before the court, and have been brought to my notice by the authorities which have been here cited in argument.

It is well established that the act of sailing with the intention of going to a blockaded port, with a knowledge of the blockade, is a violation of that blockade, and works a condemnation of the ship. If a ship engaged in the prosecution of her voyage, is advised of the existence of the blockade, and proceeds on her voyage to the port blockaded, she renders herself liable to capture and confiscation. "Where vessels sail without a knowledge of the blockade," says Sir William Scott in the case of The Columbia, 1 C. Rob. Adm. 156, "a notice is necessary; but if you can affect them with a knowledge of that fact, a warning becomes an idle ceremony, of no use, and therefore not to be required." Again; the same eminent admiralty judge, in the same decision, continues, "It is said also that the vessel had not arrived; that the offence had not actually been committed, but rested in intention only. On this point I am clearly of opinion, that the sailing with an intention of evading the blockade of the Texel, was a beginning to execute that intention, and is to be taken as an overt act constituting the offence. From that moment the blockade is fraudulently invaded." A relaxation of the

rule here laid down is found in the subsequent case of The Betsey, 1 C. Rob. Adm. 332, decided by the same authority. It was made in favor of an American ship which had been taken for a voyage from America to Amsterdam, and proceeded against for an intentional breach of the blockade of Amsterdam. "I hardly think," says Sir William Scott, "that there is sufficient evidence to affect the parties with fraud. The ship sailed when the owners were certainly informed of the blockade; but the distance of their country is a material circumstance in their favor. I certainly cannot admit that Americans are to be exempted from the common effect of a notification of a blockade existing in Europe. But I think it is not unfair to say, that lying at such a distance, where they cannot have constant information of the state of the blockade, whether it is continued or relaxed, it is not unnatural that they should send their ships conjecturally upon the expectation of finding the blockade broken up after it had existed for a considerable time." "Properly, every direction to a blockaded port," says Jacobsen, in his Laws of the Sea (page 103), "with a knowledge of the blockade, works a condemnation of the ship. Single exceptions are made of vessels from America, who were permitted to inform themselves of the continuance of a notified blockade off the port of destination; however, it is very doubtful whether the exceptions from the rule will be longer indulged, as Sir William Scott observed that it would be more pertinent to obtain information in sailing through the channel, or other passing opportunity." By an edict of the States-General of Holland, as far back as 1630, relative to the blockade of the ports of Holland, it was ordered that the vessels and goods of neutrals which should be found going in or coming out of the said ports, although they should be found at a distance from them, should be confiscated, unless they should voluntarily, before coming in sight of or being chased by the Dutch ships of war, change their intention, while the thing was yet undone, and alter their course. Bynkershoek, in commenting upon this part of the decree, defends the reasonableness of the provision, which affects vessels found so near to the blockaded ports as to show beyond a doubt that they were endeavoring to run into them, upon the ground of legal presumption, with the exception of extreme and well proved necessity. Wheat. Int. Law, 547. And Sir William Scott, in the case of The Neutralitet, 6 C. Rob. Adm. 35, a vessel found, not in port, but only near to it, held that if the belligerent party had a right to impose a blockade, it must be justified in the necessary means of enforcing that right. And if a vessel could, under pretence of going farther, approach, cy pres, close up to the blockaded port, so as to be enabled to slip in without obstruction, it would be impossible that any blockade could be maintained. "It would, I think,"

said he, "be no unfair rule of evidence to hold as a presumption de jure, that she goes there with an intention of breaking the blockade; and if such an inference may possibly operate with severity in particular cases, where the parties are innocent in their intentions, it is a severity necessarily connected with the rules of evidence, and effectual to the exercise of the right of war."

Having thus presented the authorities drawn for the most part from the other side of the Atlantic, I will now turn to the opinion of the supreme court of the United States in the case of Fitzsimmons v. Newport Ins. Co., 4 Cranch [8 U. S.] 200, delivered by Chief Justice Marshall. In answer to the question, "is the intention to enter a blockaded port (evidenced by no fact whatever), a breach of the blockade?" the court says: "This question is to be decided by a reference to the law of nations and the treaty between the United States and Great Britain." 3 Vatt. Law Nat. § 177, says: "All commerce is entirely prohibited with a besieged town. If I lay siege to a place, or only form the blockade, I have a right to hinder any one from entering, and to treat as an enemy, whoever attempts to enter the place, or carry anything to the besieged without my leave." The right to treat the vessel as an enemy is declared by Vattel to be founded on the attempt to enter, and certainly the attempt must be made by a person knowing the fact. But this subject has been precisely regulated by the treaty between the United States and Great Britain, which was in force when this condemnation took place. That treaty contains the following clause: "And whereas, it frequently happens that vessels sail for a port or place belonging to an enemy, without knowing that the same is either besieged, blockaded or invested; it is agreed that every vessel may be turned away from such port or place, but she shall not be detained, nor her cargo, if not contraband, be confiscated, unless after notice she shall again attempt to enter; but she shall be permitted to go to any other port or place she may think proper." "This treaty is conceived to be a correct exposition of the law of nations; certainly it is admitted by the parties to it, as between themselves, to be a correct exposition of that law, or to constitute a rule in the place of it. Neither the law of nations nor the treaty admits of the condemnation of a vessel for the intention to enter a blockaded port, unconnected with any fact. Sailing for a blockaded port, knowing it to be blockaded, has been in some English cases construed into an attempt to enter that port, and has therefore been adjudged a breach of the blockade from the departure of the vessel. Without giving any opinion on that point, it may be observed, that in such cases, the fact of sailing is coupled with the intention, and the sentence of condemnation is founded on an ac-

tual breach of blockade." "It cannot be necessary to state that testimony which would amount to evidence of a second attempt—lingering about the place, as if watching for an opportunity to sail into it, or the single circumstance of not making for some other port, or possibly obstinate and determined declaration of a resolution to break the blockade, might be evidence of an attempt, after warning, to enter a blockaded port. But whether these circumstances, or others, may or may not amount to evidence of the offence, the offence itself, in attempting again to enter, and 'unless after notice, she shall again attempt to enter,' the two nations expressly stipulate that she shall not be detained, nor her cargo, if not contraband, be confiscated. It would seem as if, aware of the excesses which might be justified, by converting intention into offence, the American negotiator had required the union of fact with the intention, to constitute a breach of blockade."

These authorities present clearly the principles which are to be my guide in coming to a satisfactory conclusion. I am now to inquire how far they affect the case before the court upon the evidence adduced. It is clear that the master of the Nayade, up to the moment he was warned away, did nothing in violation of law. He sailed from Hamburg in utter ignorance of the existence of the blockade. The proclamation of Commodore Conner, declaring the blockade, is dated the 14th of May last, and the Nayade commenced her voyage on the 5th of June following. It was therefore physically impossible that her master or owner could have known of the existence of the blockade at the time of her departure from Hamburg. From the testimony of her master and crew, which is all that we have on this point, they received information of it for the first time from the boarding officer of the Somers. The violation of the blockade, then (if there has been a violation at all), was committed by the master in returning to the Somers after she was warned off. The fact of returning would afford strong ground for presuming a criminal intent, and it is incumbent upon the master to rebut the presumption and justify his conduct. We have already seen that the alleged cause for returning was a want of water. This is a reason which has been commonly given by masters of vessels who have sought to justify themselves in entering a blockaded port, and the evidence of the fact must be very clear and satisfactory before it will be admitted. The testimony of the master and crew alone, unsustained by any corroborating circumstances, would be lightly received. "It is usual," says Sir William Scott in the case of The Hurtige Hane, 2 C. Rob. Adm. 124, "to set up the want of water and provisions as an excuse: and if I was to admit pretences of this sort, a blockade would be nothing more than an idle ceremony. Such

pretences are, in the first instance, extremely discredited on two grounds; that the fact is strongly against them, and that the explanation is always dubious, and liable to the imputation of coming from an interested quarter. I am not deaf to the fair pretences of human testimony, but at the same time I cannot shut my senses against the ordinary course of human conduct. I will not say that cases of necessity may not occur, that would afford a sufficient justification; and I add, that if the party can show that they were under any great necessity, and that for four or five days before they could get into no other port but the Texel, I would certainly admit such an excuse so supported. But if they cannot do this, and unless it is proved, that in coming up the channel there was no other port, either English or French, but the interdicted port of Amsterdam into which they could put, I shall reject the apology." Again; in the case of The Fortuna, 5 C. Rob. Adm. 27, he says: "The want of provisions is an excuse which will not, on light grounds, be received, because an excuse, to be admissible, must show an imperative and overruling compulsion to enter the particular port under blockade, which can scarcely be said in any instance of mere want of provisions. It may induce the master to seek a neighboring port, but it can hardly ever force a person to resort exclusively to the blockaded port."

These decisions show the caution with which such excuses should be received, and they evidently require that the fact should be presented to the court sustained by other evidence than the mere declarations of the master and crew. But although the rule laid down by Sir William Scott is stringent in its nature, I do not understand that it totally excludes all reasons based upon a want of water or provisions, as grounds of justification. On the contrary, I distinctly understand the eminent judge to convey the idea, that a case of absolute and overruling necessity may arise from the danger of perishing from famine. To contend for a moment against such a proposition would be resisting the plainest dictates of humanity. It is therefore not the fact itself we are to reject, but the suspicious evidence by which that fact is generally attempted to be proved. In the present case we are not to be governed by the testimony of the master and crew alone in ascertaining how far the alleged want of water was founded upon reality. There are certain facts material to a correct conclusion, which are satisfactorily established by the testimony of the prize master and boarding officer of the Somers, and which in my opinion, rebut the presumption that the master of the Nayade in returning to the station occupied by the squadron, had any intention of entering the harbor of Vera Cruz. The testimony of Lieutenant Berryman proves the Nayade to be a bad sailer; that she was sixteen days in performing the

voyage from Green Island to the Balize, a distance of about eight hundred miles. When the witness took charge of her as prize master, on the 31st of August, he put on board 240 gallons of water, in addition to about the same quantity, supposed to be then in the casks; and yet there remained only about 100 gallons when the brig arrived at the Balize. The testimony of her master and crew shows that on the second day after they set sail for Havana, she had made only about fifty miles: that on the 28th she was becalmed: that it was extremely warm, and there was a strong southwardly current. The distance from Vera Cruz to Havana is about one thousand miles, and fears were entertained that the current would take the vessel too far south, and that she might be taken by another vessel of war. Fears were also entertained that the water would give out before the vessel could reach Havana, as the quantity on board was on the 29th of September about 250 gallons. When I take into consideration the bad qualities of the vessel, I see nothing unreasonable in this statement, and nothing unreasonable or criminal in the determination of the captain to seek a supply of water from the squadron—the nearest accessible source from which it could be obtained. Is there anything in his subsequent conduct which will justify the conclusion that he returned for the purpose of attempting to enter the harbor of Vera Cruz? His own testimony, which is substantially corroborated by that of the mate and carpenter, shows that he steered back until the evening of the 29th, when he came in sight of land. He shortened sail that he might not get close into the shore. His object was not to go through the blockading squadron, but to approach the Somers to ask for water. He perceived the Somers at daybreak, on the morning of the 30th of August. Just after broad daylight, he perceived that it was the same vessel that had warned them off, which they did not know when they first saw her. He then steered directly for the Somers, and when he got near her he lowered his boat overboard and asked permission to go on board of her. Permission being granted, he repaired on board and asked the captain of the Somers to give him some water and take off his passengers, as he was afraid of having a long passage to Havana, and of not having water enough. The captain of the Somers answered that he would put a prize master on board of the Nayade and make a prize of her. This testimony, which unsupported, the court would feel itself bound to receive with great caution, is in all material points corroborated by the testimony of Mr. Hynson, the boarding officer of the Somers. He says: "The Nayade, after having been warned off, was next seen on the morning of the 30th of August. She was then not far from the position she held on the 27th, being a little farther to the south-

ward. When first discovered on the 30th, deponent could not determine what course she was pursuing; she seemed to be standing off and on. When they made her out, they saw she was heading to the south, towards the Somers, which was also towards the harbor of Vera Cruz." Upon cross-examination he states that "as the Somers in beating, bore off from the land, the Nayade changed her course so as to head continually towards the Somers; while her course into the harbor of Vera Cruz would have been in the direction she was making when first discovered. The Nayade had a boat out some time before she came up to the Somers. The captain of the Nayade hailed and inquired if he might come on board the Somers. Permission was given and the captain came on board, and stated that he wanted to land his passengers, that he had been detained on the coast by light winds, and was in want of water, as he feared that he had not enough to take him to Havana."

There is certainly nothing in the evidence which authorizes the belief that any fraudulent intention was entertained of entering the harbor of Vera Cruz. It would be difficult for the court to presume a fraudulent purpose on the part of the master of the Nayade when it is assured that instead of attempting to run in under cover of the night, he kept his vessel "standing off and on" until he discovered the Somers, and then "as the Somers, in beating, bore off from the land, he changed his course so as to head continually toward the Somers." The conviction thus forced upon my mind is that the alleged want of water was not a mere pretence but a reality, which presented a case (in the language of Sir William Scott) "of overruling compulsion," not certainly to run into the harbor of Vera Cruz, but to return to the squadron. Being convinced that his intentions were honest, I can see no reasons why I should now say that he should have steered for another port than the one blockaded in order to avoid even the semblance of a criminal intent, especially when it is shown that he had started for another port and was compelled to return. The general rule laid down by Sir William Scott on this point, is one which I have no hesitation in declaring should be applied in all cases in which facts are not adduced to rebut the presumption of guilt. There are exceptions to all general rules, and no court can disregard the particular facts which create the exceptions, upon the plea of sustaining a general principle. Compare the evidence in this case with that which governed the court in the case of The Hurtige Hane. 2 C. Rob. Adm. 124, and the distinction will be manifest. The latter was a Danish ship taken in the act of entering the Texel, and therefore there was no doubt as to her real intention. In the case of the Fortuna, the excuse was want of water and strong westerly winds. The general principle contended for

here was recognized, but the court admitted evidence to show that she was forced in by the winds, and afterward released her. And can it be doubted that if, in point of fact, she had been driven in by actual want of provisions, she would also have been released? In most of the cases of condemnation for a violation of blockade decided by Sir William Scott, the offences were committed on the coast of Europe, where the seaport towns were numerous, and ample opportunities were afforded to vessels suffering for want of water and provisions, to run in and procure supplies. The rule laid down by Sir William Scott requiring them to go to some other port than the one blockaded, could seldom be attended with any severity. It will readily be perceived that its rigid enforcement in cases arising on the Gulf of Mexico, where the ports are comparatively few and far separated, might sometimes be accompanied with disastrous consequences. I would not be understood, for a moment, as saying anything in derogation of the rule. I believe it to be salutary in its nature, and absolutely necessary for the effectual maintenance of all blockades; and I have no hesitation in declaring that it will be rigidly adhered to in this court on all proper occasions. But in a case where it is satisfactorily shown that no attempt was made to enter the blockaded port; where, from the evidence, it would be difficult to presume that any intention to do so was entertained; where the vessel was not found, in the language of Bynkershoek, "so near the blockaded port as to show, beyond a doubt, that she was endeavoring to run into it,"—for she came up to the Somers thirty miles from the harbor of Vera Cruz—I can see no reason for its enforcement. The reason for going to the harbor of Havana was such as would, doubtless, have influenced any man under similar circumstances. The captain was well acquainted with the harbor, which he could enter without a pilot; and he was, besides, advised to go there by the boarding officer of the Somers, Mr. Hynson, who informed him that another Hamburg vessel, the Julius, which had been warned off, had gone thither. The master of the Nayade did not pretend that, at the time he returned to the Somers, he was in immediate want of water. But when the progress of his vessel was resisted by the opposing current, and when, on account of calms, he made no progress at all, he naturally became alarmed lest his supply would be insufficient for the voyage to Havana. Still, the case of overruling necessity existed; for whether it was immediate or remote, if it was plain that it must inevitably prove hazardous to continue the voyage, he is more to be commended for providing against the danger which threatened, while it was in his power to do so, than to proceed, in the face of danger, against his convictions, and thus peril the lives of his crew, and, consequently, the safety of a large and valuable cargo.

The proctor of the captors has contended that the pretended want of water was improbable, as appears by the testimony of the master of the Nayade himself. The evidence of the crew of the Nayade shows that they left Hamburg with 1,440 gallons of water, and that when they returned to the Somers they had 240 gallons remaining. To this quantity Lieutenant Berryman, the prize master, added 240 more; making in all 480 gallons, with which the vessel set sail for New Orleans. On her arrival at the Balize, there were remaining on board 100 gallons; showing a consumption of 380 gallons in sixteen days, the time required to perform the voyage from Green Island to the Balize. Upon this statement of facts, the proctor of the captors argued (and certainly with irresistible force, taking this statement as true), that on the voyage from Hamburg to Vera Cruz, lasting, as it did, eighty-seven days, the Nayade would have required 2,088 gallons instead of 1,440. Notwithstanding the declaration of the captain of the Nayade that no more water was used than was really required on the voyage from Green Island to the Balize, I am perfectly well satisfied that he was mistaken, either in his statement of the quantity consumed, or of the quantity which he had on board when the prize master ordered an additional quantity. I considered it my duty to take further evidence on this point, and am fully satisfied from the concurrent testimony of several experienced commanders of vessels now in this port, that a gallon a day would be a liberal allowance for each man on board of a ship. The consumption of twenty-four gallons per day by sixteen men was therefore extravagant, and the only way it could have taken place was through carelessness. Either it was uselessly wasted, or there is a mistake on the part of the witnesses as to the actual quantity on board. That this mistake may have been innocently committed, I have no reason to doubt. None of the witnesses pretend that any measurement was made, and Lieutenant Berryman says that he made inquiry, but no examination, in regard to the quantity on board when he took charge of the vessel as prize master. But I am confirmed in the opinion that the witnesses were mistaken, by the fact, which I have fully ascertained by actual measurement, that they were also mistaken in their statement of the number of gallons they had on board when they set sail from Hamburg. The number of gallons which the casks contained was 1,648, instead of 1,440; and taking as true, or nearly true—for it is evident that there was no accurate information on the subject—that the Nayade had on board 240 gallons when she was boarded the second time from Somers, we find that each person had in the voyage consumed about one gallon and a fifth, which, though a liberal, is not an unreasonable or extravagant

allowance, when we take into consideration the sultry season of the year when the voyage was performed.

There is another fact I have ascertained by actual measurement, which will serve to show the want of accurate information on the part of the witnesses, and the consequent danger there would be in being guided implicitly by statements which are made upon supposition alone. The mate gives the number of casks on board the Nayade, and states that the large casks will contain about 100 gallons each. The report of the city gauger made from actual measurement, shows the sizes to be as follows: One of 150, two of 142, three of 117, one of 138, two of 115, one of 108, one of 121, one of 110, one of 62, and one of 34. This ignorance on the part of officers intrusted with the care of persons and property on a long voyage, is by no means commendable; but I do not allude to it for the purpose of imputing to them a criminality of design in making their statements. They do not profess to be accurately informed, and their ignorance under the circumstances cannot be called dishonesty. The most essential fact to be ascertained after all is, was there a want of a sufficient quantity of water on the Nayade to take her to Havana? As I have before intimated, I am satisfied that on this point the apprehensions of her master and crew were well founded. That these apprehensions were shared in to a certain extent by Lieutenant Berryman himself, is evident from the fact that he ordered an additional supply; and this precaution on his part was justified by the fact that on the arrival of the vessel at the Balize there were remaining on board only 100 gallons. Although I am satisfied that more was used than was actually necessary, it is yet quite clear that without the additional quantity put on board by the prize master, there would not have been sufficient for the voyage; and if there was not sufficient for the voyage to this port, it is perfectly manifest that there could not have been sufficient for the voyage to Havana, at least 200 miles further.

After a calm and deliberate consideration of all the facts of this case, I am satisfied that the return of the Nayade was prompted by no fraudulent design on the part of her master to violate the blockade, but the circumstances under which he was warned away devolve upon the court a duty to the captors which must now be discharged. The evidence is perfectly clear that the master was distinctly asked by the boarding officer of the Somers if he stood in need of provisions or water, and he replied that he wanted nothing. His return and demand for water three days afterwards, naturally created surprise and distrust on the part of the captors, and justified the course they pursued. The master of the Nayade has explained his conduct by saying that the reason he did not accept the offer of water made him on the 27th by the boarding officer, was that that gentleman remained on board the Nayade only fifteen minutes, and told so many things about the blockade, that he (the master), this being his first voyage as captain, was so bewildered that he did not take time to reflect or examine, but was desirous of getting off as soon as possible. Besides, the wind was at that time favorable for a voyage to Havana. The boarding officer, Mr. Hynson, also testifies that the captain, when warned off, seemed undecided what to do and was very much confused. Now, without taking upon myself to decide how far such embarrassment and confusion are inconsistent with that self-possession and decision of character which should always signalize the conduct of a commander of a vessel, but giving to this master all the benefit of his explanation, and believing, as I do, that his confusion arose from having his long and tedious voyage suddenly broken up at the very moment when he believed it was to terminate, and by the consequent loss and disappointment to which not only he but the owners of the large and valuable cargo were about to be subjected, it is yet clear that his private feelings, however honest, could not be taken as the criterion by which the captors were to regulate their public conduct. It was not their duty to institute an examination into all the facts and circumstances connected with the re-appearance of the vessel near the station occupied by the blockading squadron. The case was prima facie one which justifies their conduct; and although I feel bound to order the vessel and cargo to be delivered up, I shall order the costs of this action and the expenses actually incurred by the captors in bringing the vessel to this port, to be first paid by the captain, as agent of the owners. Upon the principle repeatedly recognized by Sir William Scott (The Imina, 3 C. Rob. Adm. 170, and The Adonis, 5 C. Rob. Adm. 258), I am satisfied that the owners of the cargo cannot properly be held liable for these costs and expenses. The master is not de jure their agent, unless so specially constituted by them, and they are not to be held responsible for the consequences of his acts. I therefore decree restitution upon the condition here prescribed.